**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF VIRGINIA**

**Norfolk Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **CRIMINAL NO. 2:25cr31** |
| | ) | |
| **ALEX TYLER BUENAGA,** | ) | |
| | ) | |
| ***Defendant.*** | ) | |

**GOVERNMENT'S POSITION WITH RESPECT TO**
**SENTENCING FACTORS IN THE PRESENTENCE REPORT**

COMES NOW the United States of America, by undersigned counsel, and in accordance with Section 6A1.2 of the Sentencing Guidelines and Policy Statements and this Court's policy regarding guidelines sentencing, the government hereby represents that it has reviewed the presentence report (PSR) prepared by the United States Probation Officer. After reviewing the Presentence Investigation Report and applying the factors of Title 18, United States Code, Section 3553(a) to this case, the government's position is that a statutory maximum sentence for all three counts of conviction (Life plus 60 years of incarceration) is appropriate.

## I. The United States Has No Objection to the PSR

The United States hereby represents that it has no objections to the facts, the findings or to the calculations of the presentence report. The United States has received one victim impact statements from the victims in this case and it has been provided to the Probation Officer and to the defendant. Three of the victims are seeking restitution and those restitution claims have been resolved. Should any additional victim impact statements or restitution requests be received, the government will forward them to the Court and defendant prior to sentencing. The United States will introduce some of the chats the defendant engaged in at the sentencing hearing and will file

them under seal in a separate filing. The United States further reserves the right to present evidence to rebut any of the defendant's claims.

## II. A Sentence of Life plus 60 Years of Incarceration Complies with the Factors and Considerations Set Forth in 18 U.S.C. § 3553(a) and (b).

In *United States v. Booker*, 543 U.S. 220, 264 (2005), the Supreme Court made clear that sentencing courts should "consult [the Sentencing] Guidelines and take them into account when sentencing." *See also United States v. Biheiri*, 356 F.Supp.2d 589, 593 (2005) ("Justice Breyer's majority opinion in [*Booker*] sensibly teaches that the Sentencing Guidelines must still be taken into account pursuant to 18 U.S.C. § 3553(a) in fashioning an appropriate sentence."). The Supreme Court provided this direction to promote the sentencing goals of Congress, namely to "'provide certainty and fairness in meeting the purposes of sentencing, [while] avoiding unwarranted sentencing disparities[.]'" *Booker,* 543 U.S. at 264 (*quoting* 28 U.S.C. § 991(b)(1)(B)). The Fourth Circuit has provided the following guidance in the wake of *Booker*:

> A district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing the sentence.

*United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). Thus, sentencing courts must consider the factors outlined in 18 U.S.C. § 3553(a).

Section 3553(a) requires a sentencing court to consider the nature and circumstances of the offense and the history and characteristics of the defendant, as well as the need for the sentence imposed to: reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. Applying these sentencing factors to the facts of this case demonstrates that a life sentence of incarceration

is appropriate and reasonable.

**A. Nature and Circumstances of the Offense**

Defendant ALEX TYLER BUENAGA should spend the remainder of his life incarcerated. In the summer of 2024, MV1 was born and came into the defendant's life. While most people would welcome this event with unbridled joy, it's safe to say that the defendant welcomed this event as an opportunity to explore his sexual deviance. The defendant saw MV1 as nothing more than a living sex doll that he could sexually assault and abuse. The abuse began quickly. At only 3 months old, the defendant first recorded his sexual abuse of MV1 when he photographed himself performing oral sex on her. Over the course of the next three months, this abuse rapidly intensified. Between October 2024 and January 2025, when the defendant was arrested, the defendant recorded himself sexually assaulting and abusing MV1 147 times and created 89 images and 58 videos. MV1 was only 3 months old when the abuse began and 6 months old when it ceased upon the defendant's arrest. Sexually abusing any child is a horrific crime that deserves severe punishment. This case is an extreme outlier for the depth of the defendant's depravity and therefore deserves an extreme sentence. In weighing a sentence in this case, the Court needs to consider certain facts that make this case and the defendant's conduct so reprehensible.

First, as noted above, is the tender age of MV1. It is indisputable that MV1 is as vulnerable a victim as the Court will ever see. A child between 3 to 6 months old is as completely defenseless as a human being ever is in their entire life. A child this age is unable to walk, crawl, or effectively, move, completely unable to comprehend what is happening to them, unable to offer any resistance to the assault, and unable to report or remember the abuse. They are at their most vulnerable and need the most protection from their caregivers to protect them from the kind of abuse that was suffered in this case. It is also exceptionally rare to see cases with children this young as victims.

Second, the Court should consider the role the defendant played in the abuse. MV1 was in his care and custody and the abuse occurred while MV1's mother was away at work. MV1's mother trusted the defendant to care for MV1 and the defendant abused that trust over and over again. The defendant's violation of MV1 did not stop because he had any conscience or guilt over what he was doing. It only stopped through the actions of law enforcement investigating these crimes and arresting him. But for law enforcement, we can safely assume that the defendant would be sexually assaulting MV1 to this day.

Third, the Court needs to consider the actual sexual acts perpetrated against MV1. The defendant did not simply molest or touch MV1 inappropriately. Rather, he committed extreme and dangerous sexual assaults against MV1. In these 147 files the defendant created, he performed oral sex on MV1 and penetrated her vagina and anus with his fingers and inanimate objects, such as a sharpie style marker. To the best of his ability, the defendant placed his penis in MV1's mouth, vagina and anus on multiple occasions attempting to penetrate her. The defendant restrained MV1 by tying her to the bed upon which he was abusing her and utilized Vaseline to lubricate his penetrations of MV1. The defendant on at least one occasion force fed MV1 his own urine and on another occasion he smoked methamphetamines and exhaled the methamphetamine smoke into MV1's face. All of these behaviors the defendant documented by way of photos and videos.

Fourth, the defendant openly shared and distributed the images of his abuse against MV1 online with very little concern or discretion to whom he distributed them. The defendant engaged with various online communities on various platforms in which he freely shared these images and videos. The defendant's open and notorious sharing of these files caused him to get banned from at least one of these platforms. That didn't stop him. The defendant continued his online activities and eventually a report made its way to the Federal Bureau of Investigation (FBI). FBI

agents realized the danger and harm that was actively occurring to MV1 and took quick action to save MV1 and arrest the defendant. However, we will never know the full extent of the online harm the defendant caused. We all know that once files are distributed online, they could potentially live forever. Any victim of child sexual abuse who has had their images shared online can attest that their lives are forever impacted by the repeated and continuous trading of these images. One day MV1 may have to reckon with this same reality all because of the depravity of the defendant.

Finally, and perhaps most disturbingly, the defendant openly invited others to participate in the sexual abuse of MV1 and routinely bragged about it online, including with his co-defendant Ryan Wade Johnston. In chats with other users, the defendant bragged about abusing MV1 and offered her up for these other users to travel to the defendant's house and participate in the sexual abuse of MV1. These conversations are striking in the callous manner in which the defendant routinely refers to MV1 and absolutely shocks the conscience. For instance, in a series of conversations with an unknown user, the defendant states about MV1, "I don't care about her wellbeing she's there for my cum". After sharing sexually explicit pictures of MV1 with this unknown user, the defendant continues, "I want to be dirty. You tell me what to do and I'll do it as long as it doesn't seriously hurt her…No I mean I'll do anything to her".

| | | |
|---|---|---|
| Alex Bunga | I'll call again. I want to be dirty. You tell me what to do and I'll do it as long as it doesn't seriously hurt her | 1/21/2025 6:15:58 AM(UTC+0) |
| Alex Bunga | No I mean I'll do anything to her | 1/21/2025 6:17:48 AM(UTC+0) |
| e | Outgoing voice call | 1/21/2025 6:19:08 AM(UTC+0) |
| Alex Bunga | I just don't want her to get to screaming and wake up her mom | 1/21/2025 6:33:18 AM(UTC+0) |
| Alex Bunga | What would you do if you were here | 1/21/2025 6:35:30 AM(UTC+0) |
| Alex Bunga | Mmmmm i actually spit piss into her mouth earlier | 1/21/2025 6:42:48 AM(UTC+0) |

We know this isn't fantasy talk because the defendant accurately recounts the things he has done to MV1, such as spitting "piss into her mouth earlier". If these messages weren't bad enough, later on the defendant commences a video chat with this unknown user to broadcast

MV1's sexual abuse. The defendant tells the unknown user he needs to wait for his wife to go to bed because he, "can't have her walking in on [the defendant] facefucking and pissing on her little girl". When the unknown user suggests to the defendant that "forcing [the wife] to watch would be hot", the defendant replies, "mm actually yes it would…tie her up and tape her eyes open". The unknown user shares his rape fantasies with the defendant to which he replies, "Oh fuck that'd be hot. Come rape my baby". The conversation concludes with the defendant stating that MV1 is a "good little whore" and that the defendant "absolutely will rape [MV1]…oh buddy you've hardly seen anything. I won't hesitate. Her holes are mine and only mine."

| | | |
|---|---|---|
| Alex Bunga | In a second. Waiting for wife to go back to bed | 1/21/2025 7:52:07 AM(UTC+0) |
| Alex Bunga | Can't have her walking in on me facefucking and pissing on her little girl | 1/21/2025 7:53:05 AM(UTC+0) |
| )-49F8-8356- PnP NL | True…although, forcing her to watch would be hot | 1/21/2025 7:53:49 AM(UTC+0) |
| Alex Bunga | Mm actually yes. Yes it would | 1/21/2025 7:54:06 AM(UTC+0) |
| Alex Bunga | Tie her up and tape her eyes open | 1/21/2025 7:56:09 AM(UTC+0) |
| )-49F8-8356- PnP NL | My idea is to force a dad to watch as I rape his baby…over and over. He's bound to a chair and can't move. And when I'm done with the baby, I start masturbating the dad, and when he's hard I push his son on his dick, making him a pedo against his will | 1/21/2025 7:56:52 AM(UTC+0) |
| Alex Bunga | Oh fuck that'd be hot. Come rape my baby | 1/21/2025 7:57:28 AM(UTC+0) |
| )-49F8-8356- PnP NL | I would in a sec…but you're very far away 😩 | 1/21/2025 7:58:03 AM(UTC+0) |
| Alex Bunga | I don't care about her wellbeing she's there for my cum | 1/23/2025 6:48:29 AM(UTC+0) |

The defendant was communicating with a user named "B Man" and the two discussed "B Man" coming to the defendant's house and "playing" with MV1. The defendant asked "B Man" if he wanted to play with MV1 and "B Man" responded by indicating he wanted to try "the pacifier" that is placing his penis in MV1's mouth and then have the defendant clean up his ejaculate from MV1. In another chat with a user named "Doc" the defendant states that "Doc's" penis will look good on MV1 and asks "Doc" to just "come by and give [MV1] a load" and further

states "Bro please I'm so excited". In another chat with user "S", the defendant states that he has done everything to MV1 except "force his dick in" but that he has "forced it in her throat". When "S" expresses concern that his own daughter is teething, the defendant advises that she won't bite but will "suck like a pacifier." The defendant further stated that every time he plays with MV1 he "tries his cock and one day it will slip in." In another chat with user "Sor Bee", the defendant performed abuse on MV1 at the direction of "Sor Bee".

The defendant engaged in these explicit conversations with at least 6 different users, including with his co-defendant Ryan Wade Johnston. As noted above many of these users received images of MV1's sexual abuse and participated in through online webcam sessions. Many of these users were invited over to participate in the assaults live and in person, but only one person took the defendant up on his offer to sexually abuse MV1 and travelled to the defendant's residence. That was co-defendant Johnston who along with the defendant were arrested in January 2025. There is no doubt that Johnston and the defendant intended to sexually abuse MV1 on the basis of their chats leading up to their arrests.

When all of the facts surrounding the defendant's behavior are considered, this Court can only reach a single conclusion. The defendant's actions toward MV1 represent some of the most vile and reprehensible behavior any person can inflict on another, especially a victim so young and defenseless. The defendant's conduct is exacerbated by the relationship that existed between the defendant and MV1 and merits a life sentence.

**B. Characteristics and History of the Defendant**

The defendant has no criminal history whatsoever. His educational and employment records also indicate that he is intelligent and hard working. He has taken college courses and holds various certifications as a paramedic, rescue diver, and firefighter. He is in good physical health and suffered from no abuse as a child. He has struggled with his mental health

throughout his life and has recently struggled with substance abuse over the last year prior to his arrest. None of these challenges provides justification nor excuse for the defendant's behavior in the instant matter and the defendant's online chats conclusively demonstrated his knowledge of the wrongfulness of his actions. Defendant repeatedly expressed concern to the people he was chatting with that they were not law enforcement or "Chris Hanson", the famous host of the "To Catch a Predator" television program. The defendant also indicated he used various chat programs because of their ability to erase evidence of his activities and on the day of his arrest was concerned that he had been banned by the online Reddit platform. These actions demonstrate that defendant was well aware of the unlawfulness of his actions.

**C. Need to Deter Future Criminal Conduct and to Protect the Public**

The defendant's sentence needs to accomplish the twin goals of deterring the defendant from engaging in future criminal conduct and to protect the public. The government avers that there is a strong likelihood that the defendant will return to abusing minor children. Further, the risk that the defendant and offenders like him pose to society support a significant sentence of imprisonment. This defendant, in particular, poses a tremendous risk that he will re-offend because of the sheer magnitude and depravity of his offenses. A life sentence is therefore required to protect the public and deter him from considering the possibility of engaging in future misconduct once released from incarceration.

**D. Need to Provide Treatment to the Defendant**

Due to the nature of the defendant's crimes, the defendant should be ordered to participate in a sex offender treatment program while incarcerated.

**E. Other Relevant Factors**

Section 3553(a) also addresses other the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, to afford adequate

deterrence to criminal conduct, and to prevent unwarranted sentencing disparities. The gravity of this case makes clear that only a statutory maximum sentence would adequately address all of these concerns. Anything less would be a disservice to these factors.

## III. **Conclusion**

For these reasons, as well as additional reasons to be more fully articulated during the sentencing hearing on this matter, the United States respectfully requests that the Court sentence the defendant to a term of life plus 60 years of confinement.

Todd W. Blanche
Attorney General

Theophani K. Stamos
First Assistant U.S. Attorney

By /s/

Joseph L. Kosky
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
Office Number (757) 441-6331
Facsimile Number (757) 441-6689
E-Mail Address - joseph.kosky@usdoj.gov