**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:25-cr-31-001** |
| | ) | |
| **ALEX TYLER BUENAGA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S POSITION ON SENTENCING**

When the Court crafts a sentence, it must perform a difficult balancing, even when the stakes are relatively low: consider the crime, consider the person, weigh the purposes of sentencing, and impose a sentence that is not one day longer than necessary.

In cases like this one, beyond the pale, that task is exponentially more difficult. The offense conduct threatens to overwhelm all other considerations. It becomes easy to lose perspective on the punishments being considered, and to dehumanize the person standing before the Court.

Alex Tyler Buenaga did monstrous things. But he is not a monster. He is a broken man. What he did cannot be rationalized, but it can be understood as an outgrowth of trauma, substance abuse, and treatable mental health conditions. Those same conditions are precisely why structured, evidence-based treatment in the Bureau of Prisons should meaningfully reduce Mr. Buenaga's risk of recidivism. With that understanding, Mr. Buenaga hopes that the Court will understand that a sentence consigning him to die in prison would be greater than necessary. A life sentence is greater than necessary.

Considering Mr. Buenaga's life and the factors that contributed to his conduct, a sentence of 30 years of imprisonment, combined with lifetime supervised release, is sufficient to accomplish all purposes of sentencing under § 3553(a)(2).

## INTRODUCTION

There is no excusing Mr. Buenaga's conduct, and nothing in this position paper is meant to diminish the trauma inflicted on his victims or the justified anger of this community. On January 24, 2025, federal agents ended the abuse and arrested him. He has now spent nearly two years in custody, and he faces decades of imprisonment for offenses that shattered the lives of those who loved him and destroyed his life. Yet it is this Court's obligation under 18 U.S.C. § 3553(a) to view the man before the Court—not merely the crime—when determining an appropriate sentence.

There are no letters of support for Mr. Buenaga. Those bridges are burned, perhaps never to be rebuilt. But in anticipation of sentencing, the defense retained three experts to provide insight into Mr. Buenaga's background, cognitive functioning, mental health, offense conduct, and risk of recidivism. *See* Exh. 1A, Curriculum Vitae of Dr. Shauna Keller; Exh. 2A, Curriculum Vitae of Dr. Katherine Robinson. The evaluation reports of Dr. Keller and Dr. Robinson are attached as exhibits to this pleading and contain their methods, analyses, and conclusions. *See* Exh. 1B, Forensic Evaluation by Dr. Keller; Exh. 2B, Forensic Evaluation by Dr. Robinson.

The third expert, Mark Ruffalo, psychotherapist, Ph.D., MSW, and Assistant Professor of Psychiatry, will be present at sentencing to testify about the overarching mental health diagnosis for Mr. Beunaga, along with the carceral and community treatment that is responsive to that diagnosis. *See* Exh. 3, Curriculum Vitae of Mark Ruffalo, Ph.D., MSW. Specifically, Mr. Ruffalo will explain the psychiatric diagnosis involved here, along with the psychotherapy available with a focus on actual clinical treatments. Further, he will interpret and contextualize the findings of the prior evaluations with an eye toward explaining how such treatment is applied to those with BPD, the difference between BPD and other disorders that are not amenable to treatment, and address the relationship between the diagnosis and the offense conduct. It should be noted that he

is not a forensic speciliastic; along with teaching, Mr. Ruffalo treats patients and supervises students going into the psychiatric fields.

The reports and testimony will establish that Mr. Buenaga is much more than his crime. He is not a "lost cause" for whom the only answer is incapacitation. He is eager to engage in rehabilitative programming and treatment in prison and in the community, should he be allowed to return. He has gained considerable personal insight since his arrest. He will not be returning to the environment that contributed to his commission of the offense, and he will acquire tools to deal with the stressors and unmet needs that set him down a dark path. For these reasons along with those more fully set forth below and through testimony, a sentence of 30 years of imprisonment will best accomplish the purposes of sentencing and comply with the parsimony principle fundamental to federal sentencing. *See* 18 U.S.C. § 3553(a) (directing the Court to impose a sentence "sentence sufficient, but not greater than necessary, to comply with the purposes [of sentencing].").

## THE SENTENCING FACTORS SUPPORT A 30-YEAR TERM OF IMPRISONMENT

### I. A sentence of 30 years adequately accounts for the nature and circumstances of the offense.

The Court is confronted with two very different pictures: Alex Buenaga as he appeared to those in the community, and the crimes he committed in a dark corner of the internet. As the Presentence Investigation Report ("PSR") recounts, the language and nature of the chats animating Mr. Buenaga's crimes are shocking, as are the descriptions of his conduct. Those threaten to crowd out all other aspects of Mr. Buenaga's character. However, there is more to consider about the offense than what is set forth in the PSR.

First, Mr. Buenaga has taken responsibility for his conduct before this Court. He fully admits what he did, and he recognizes that it deserves substantial punishment. Since his arrest, he

has demonstrated meaningful growth in his capacity to recognize the impact of his actions. His agreement to pay restitution and all relevant special assessments reflects his understanding of the harm he has caused, contrasting with his beliefs at the time of the offense and immediately after, showing significant reflection and growth even without access to comprehensive mental health counseling and sex offender treatment.

Some may charge that it took Mr. Buenaga too long to plead guilty or speculate that his plea was pragmatic acceptance rather than honest remorse. Those making such an assumption are wrong. Under the terms of the plea agreement, the applicable statutory range of imprisonment for Mr. Buenaga's offense is 15 years to life. The applicable advisory Sentencing Guidelines range is life. And the government requests a sentence of life plus sixty years, regardless of the guilty plea and the benefits of not proceeding with a painful trial. Mr. Buenaga's decision to plead guilty, knowing the punishment he faces, is not just pragmatic. It is remorse for something that cannot ever be forgotten, or undone.

Second, it is critical to view this offense conduct through the lens of the expert evaluations, which illuminate the factors that precipitated Mr. Buenaga's behavior and, more importantly, his amenability to treatment. Doing so supports the hope that Mr. Beunaga will be able to overcome his internal struggles and, someday, safely rejoin the community without risking future harm.

Dr. Katherine Robinson, Psy.D., CSOTP, performed a comprehensive psychosexual risk assessment at the defense's request. Dr. Robinson found that Mr. Buenaga does not meet the criteria for Pedophilic Disorder. *See* Exh. 2B at 12, 14–15. In Dr. Robinson's professional assessment, the constellation of Mr. Buenaga's sexual interests, as evidenced by his developmental history, prior relationships, and patterns of attraction, does not conform to the clinical diagnostic criteria for persistent or exclusive sexual interest in children. Rather, Mr. Buenaga is aroused by

adult women with "developmentally mature physical features." This assessment supports that his conduct was not driven by a lifelong, stable pedophilic sexual orientation (i.e., innate sexual attraction to children); instead, it likely was driven significantly by the combined dynamics of mental illness, substance abuse, and a distorted pursuit of affirmation and control.

This distinction matters for sentencing because it informs the question a recidivism risk: Is this defendant likely to commit this offense again? Dr. Robinson's assessment that Mr. Buenaga does not meet criteria for Pedophilic Disorder, when combined with her overall evaluation that his recidivism risk is in the "average" range (and was initially scored "very low"), provides empirical support for believing in rehabilitation over recidivism. The dynamic factors driving this offense—emotional dysregulation, substance abuse, impulsivity, and the search for validation—are precisely the targets of evidence-based treatment. Conversely, as Dr. Robinson explains, when a person shows a stable pattern of exclusive sexual interest in children, such pedophilic interests are chronic and resistant to change. But in Mr. Buenaga's case, his conduct was reactive, situational, and driven in large part by the untreated mental health conditions that this Court will have an opportunity to address through a substantial prison sentence combined with evidence-based treatment.

## II. A 30-year sentence is appropriate in light of Mr. Buenaga's personal history and characteristics.[1]

Besides the nature of this offense, the Court must consider Mr. Buenaga's character and history. His crime should be viewed as an anomaly. He otherwise acted pro-socially for almost all of his life, helping his family, being part of his community, and training to be an EMT and

[1] The information contained herein comes from the PSR, the expert reports, and discussions with Mr. Buenaga. Family and related persons have requested that they not be named, and Mr. Buenaga respects this request.

firefighter specifically with the intention of providing medical care to individuals in unexpected, emergency situations. His crime was instead an outgrowth of a confluence of treatable issues.

A. *Mr. Buenaga's childhood and early adulthood*

Mr. Buenaga was born in 1993, in Red Bank, New Jersey. His parents already had lost another child two years prior, a death that occurred on Mr. Buenaga's mother's birthday, and they were still grieving. Mr. Buenaga's middle name, and that of his own son, carry his deceased brother's memory. Around the age of two, Mr. Buenaga's family relocated to Northern Virginia, from the small commuter town.

When Mr. Buenaga was around six years old, his younger brother was born, and the family soon learned that the baby suffered from a mitochondrial genetic disorder. This disorder requires full-time care due to resulting physical and cognitive disabilities that increase with age.[2]

Unsurprisingly, the family's financial situation was impacted. His father worked outside of the home, while his mother acted as a full-time caregiver for her youngest son. The area in which they lived was a bedroom community for the Washington, D.C., which became increasingly expensive. To maintain the family's stable housing situation, Mr. Buenega recalls moving to Wilmington, Delaware, around the age of eleven.

Mr. Buenaga relates that his relationship with his father has never been close, sharing that "his father was emotionally unavailable and primarily occurring an enforcement role." *See* Exh. 1B, at 4. There were times growing up that his father refused to talk to him for months, giving him the "silent treatment." Although he does not recall why, Mr. Buenaga came to believe it was a

[2] Mitochondrial genetic disorders originate from the mother of a child, and it can be passed on to male and female offspring generationally. Mr. Buenaga's mother is a carrier, and it is unknown if his deceased brother suffered from the same disorder, but Mr. Buenaga requests genetic testing for the benefit of his children's knowledge.

shortcoming related to him, rather than his father. His mother was always put in the middle of the strained relationship, trying to maintain peace in the home, while caring for her disabled son—"physically present, but less emotionally supportive." *See* Exh. 1B, at 4. Looking back, Mr. Buenaga feels that his parents never had a chance to grieve the loss of their first born and that he failed as a replacement child. He rarely received positive attention and approval like normal children.

As a child, Mr. Buenaga liked school, but things changed when his younger brother enrolled. Due to his disabilities, his brother suffered bullying, and Mr. Buenaga was quick to defend him. Over time, as his brother's needs became more intense, they no longer attended school together. Mr. Buenaga's love for his brother should not be doubted; "however, he also recalled feeling "overshadowed," as Dr. Keller notes. *See* Exh. 1B, at 4. One of the biggest losses he has experienced due to his conduct is an end to daily video calling with his brother.

As he grew older and struggled more and more with his family dynamic, Mr. Buenaga began to become more interested in things outside of school, including skateboarding. He self-identified briefly as a "skater punk." Eventually, his attention turned to bicycling. His junior year of high school, he obtained his first job at a bike shop as a bike repairman. It was a source of pride to bring home a paycheck. He sought his parents' recognition, but as with other accomplishments, he perceived "their responses as muted"; Dr. Keller summarizes that while Mr. Buenaga's upbringing "was not characterized as abusive or devoid of care, his history suggests a pattern in which his emotional needs were not consistently recognized or met." *See* Exh. 1B, at 5.

Around the time school became less of a priority, Mr. Buenaga began to experiment with marijuana, and eventually, alcohol. These substances provided an outlet that distracted from his troubles, helping set Mr. Beunaga on a path to more extreme outlets.

Along with his work at the bike shop, Mr. Buenaga began to volunteer at the fire department, quickly falling in love with the work. Although his grades were slipping, and his wish to go into the Navy like one of his grandfathers was becoming less realistic, Mr. Buenaga sought a college experience where he could learn the discipline of the military while pursuing his interest in firefighting. In fact, the very first tattoo his got was the Fireman's Maltese Cross. By August of 2011, Mr. Buenaga was off to Old Dominion University ("ODU") and Navy ROTC (Navy Reserve Officers' Training Corps).

B. *College and the Pursuit of a Firefighter EMT's Career*

It was during college that things really started to unravel. ROTC required early arrival at ODU, and the sudden transition from partying teenager to the military lifestyle was a shock. Mr. Buenaga shared that, "It was the most fun I never want to have again." Unfortunately, a similar cycle as to high school started, with the thrill of school and ROTC wearing off. By May 2013, Mr. Buenaga withdrew from ODU and ROTC.

Throughout the summer of 2013, Mr. Buenaga went back to what he knew as a bike mechanic, trying to figure out what he wanted to do with his life. He enrolled in the emergency medical services program at TCC in the Spring of 2014. Later than year, he took the Emergency Medical Technician certification, passing on the first try. He continued to go to TCC, but he again lost interest in school and withdrew before completing the program. At the time he withdrew, Mr. Buenaga reports that alcohol use had become a big problem, causing a downward spiral and impacting his ability to work.

Again, knowing that this could not remain his trajectory, Mr. Buenaga enrolled in the TCC accelerated paramedic program, and by August 2016, obtained his paramedic certificate. By January 2017, he was working at the Newport News Fire Department. The work as a first

responder, initially experienced while in high school, reflected Mr. Buenaga's attraction to high-intensity activities, providing "repeated experiences of emotional activation, competence, accomplishment, and recognition." *See* Exh. 1B, at 5. Later that year, Mr. Buenaga entered into his first marriage. When the couple welcomed their son, Mr. Buenaga shared that it was the first time for a very long that his father showed pride in him. His life seemed to be on an upswing.

Unfortunately, while the invigorating satisfaction of his work continued, it was not enough. Mr. Buenaga increased his drinking, became unfaithful to his wife, and started to pursue risky and same-sex sexual experiences where he rarely knew the name of the partner with whom he was connecting. He describes himself as struggling to be "emotionally present." Eventually, his marriage failed. As Dr. Keller found, "Mr. Buenaga increasingly relied on external stimulation and impulsive behaviors to regulate distress, obtain affirmation, or temporarily alleviate feelings of emptiness and disconnection." *See* Exh. 1B, at 5. He did what he could to satisfy these feelings through the behaviors in which he participated, but they only provided temporary relief or validation, contributing "to an increasingly self-reinforcing pattern of emotional dysregulation, impulsivity, and maladaptive coping." *Id.*

When his first marriage ended in 2021, Mr. Buenaga began looking for another committed relationship, hoping to fill the void he had always felt. He describes his second marriage as being to the love of his life. Sadly, we know how this story ends. By 2024, his self-destructive behavior, including substance abuse, infidelity, identity struggles, and unmet need for affirmation, took him down the dark path that has brought him before the Court for sentencing.

### C. *Borderline Personality Disorder and Seeking the Answer to "Why?"*

On June 2, 2024, Mr. Buenaga turned to methamphetamine to alleviate his discomforts. He spent the day using it, hosting an orgy at his home, and he became upset that his wife who was

seven months pregnant would not participate. He had totally lost control. When he sobered up, he begged for her forgiveness, swearing he would get himself together. She stayed, against her better judgment, and for four months, Mr. Buenaga maintained his sobriety. He obtained mental health counseling, fighting off thoughts of suicidal ideation. This was in his private life, unknown to his other family members or coworkers.

Mr. Buenaga began to think he had things under control, and he soon chose to use a little cocaine, believing he would be fine since it was less risky than meth. Instead, he was soon back to using meth again, along with cocaine, losing control once again. This time, his erratic behavior and need for affirmation went beyond anything that had happened before, resulting in extreme misconduct.

Let's be clear: There cannot ever be an excuse or explanation as to what happened to MV1 and those others directly impacted by Mr. Buenaga's conduct. There are no "take backs."

But there are multi-faceted answers to "why?" Those answers paint this crime in a different light than a raw recitation of the facts. A combination of factors contributed: Mr. Buenaga's personality, his cognitive strengths and weaknesses, substance use, and ingrained expectations.

A diagnosis of borderline personality disorder explains a great deal. According to Dr. Keller,

> Mr. Buenaga's developmental trajectory is consistent with the core features of Borderline Personality Disorder, including chronic feelings of emptiness, an unstable sense of self, sensitivity to interpersonal disconnection, impulsivity, and difficulty regulating affect. His history further suggests that these features became more pronounced during periods of increased stress and substance use, providing clinical context for the escalation of his maladaptive behaviors preceding the instant offense. Although his history reflects periods of self-focused and poorly considered decision-making, the available history does not reflect the pervasive pattern of disregard for the rights of others, lack of remorse, deceitfulness, and irresponsibility required for a diagnosis of Antisocial Personality Disorder (ASPD). Rather, his behavioral choices are better understood as impulsive or reactive efforts to obtain attention, stimulation, connection, or relief from uncomfortable emotional states.

*See* Exh. 1B, at 5–6. This condition grew out of Mr. Buenaga's difficult childhood. While his needs for food, housing, and education were met, he developed an "enduring sensitivity to interpersonal attention and disconnection" and came to rely on "external recognition to reinforce his sense of worth." *Id.*

> These early patterns appear to have become increasingly entrenched during adolescence, particularly following a prolonged period of relational disconnection from his father. Rather than developing consistent internal strategies for identifying, tolerating, and communicating difficult emotions, Mr. Buenaga's early behavioral difficulties, including conduct problems and acting out at school, can be understood as maladaptive efforts to obtain attention or a sense of significance when his emotional needs for connection and recognition were not otherwise met.

*Id.*

Borderline personality traits are a factor contributing to the offense, but not the only one. Mr. Buenaga's early attachment misattunement likely contributed too. *Id.* at 4. From a young age, feeling "in the shadows" damaged his self-esteem. He felt intense pressure to receive affirmation and believed he was failing to meet expectations, often living a self-fulfilling road to failure. These impulses also led him to value the feedback of internet deviants who egged on his behavior.

D. *Mr. Buenaga now and in the future*

It has been almost two years since Mr. Buenaga was arrested. Shortly before his arrest, he received mental health treatment. Even without consistent treatment, though, Mr. Buenaga's perspective on the offense has changed since his arrest. He is now able to focus on the impact his conduct had on the victims. He knows his conduct was harmful and not justifiable.

Still, Mr. Buenaga has been an inmate at Western Tidewater Regional Jail for a year and a half and has not received the comprehensive mental health treatment he needs. He is willing to participate in any psychiatric and psychological treatment. He also wants to participate in sex offender treatment and substance abuse treatment.

The experts' reports paint a complex picture of Mr. Buenaga and his conduct but should ultimately leave this Court optimistic. As Dr. Keller concisely summarized, "Mr. Buenaga's substance use, emotional dysregulation, trauma-related symptoms, and interpersonal difficulties are functionally interconnected." Exh. 1B, at 8. Treatment that focuses on managing the characteristics of Mr. Buenaga's personality disorder, rather than extinguishing them, have been shown to be effective. Dr. Keller provides recommendations for treatment within the Bureau of Prisons as well as the community, upon Mr. Buenaga's release. *Id.* at 7–8.

Separately, Dr. Robinson notes that, although Mr. Buenaga's scoring on the Static-99R recidivism-risk measure placed him in a "very low risk" category, she assessed several dynamic (i.e., treatable) factors placed him in the "average risk" category," lending more credibility to her findings. Exh. 2B, at 13–14. Specifically, Dr. Robinson increased the risk primarily due to (1) his borderline personality disorder, (2) an impulsive, antisocial lifestyle, and (3) sexual deviance, as defined in the relevant psychological/psychiatric community. *See id.* Dr. Robinson's recommendations are consistent with those set forth by Dr. Keller as well as those generally set forth by this Court. *Id.* at 17. Again, the upshot is that there is hope for Mr. Buenaga.

Mr. Buenaga's progress so far weighs in favor of a sentence of 30 years of imprisonment—a lengthy sentence of decades. Now that Mr. Buenaga's personality disorder has been identified, it can be managed. He can confront and learn to cope with his cognitive deficits through treatment and rehabilitative programming. At the same time, substance abuse treatment will address his very problematic alcohol and substance use. Mr. Buenaga has described his future as "an uphill battle." He acknowledges that he has a long way to go and must participate in rehabilitation and treatment to rebuild the trust of his community, and maybe one day, that of his family.

## IV. Mr. Buenaga acknowledges the impact on his victims and the limits of sentencing.

The victim impact statement filed by MV1's mother reflects the profound and ongoing pain caused by this offense conduct. She describes the moment she learned of the abuse as the moment her entire world shattered. She describes her ongoing struggle with anxiety, panic attacks, and the burden of eventually explaining what happened to MV1. The defense does not dispute the legitimacy of her suffering.

At the same time, it is essential to understand what a 30-year sentence does and does not mean in light of victim impact. A 30-year sentence is not a "light" punishment. Mr. Buenaga will spend the remainder of his productive adult life in federal prison. He will emerge from custody in his mid-60s, permanently marked as a sex offender, permanently estranged from his family, and permanently unable to rebuild what he has destroyed. Additionally, for MV1 and her mother, the length of Mr. Buenaga's sentence cannot change the fundamental reality: the abuse occurred, the trauma was inflicted, and healing will be a lifelong project. Retribution does not undo what cannot be undone, and for many, it does not prove palliative.

A 30-year sentence balances the undeniable harms in this case against principles of proportionality and against evidence suggesting that sustained treatment offers a realistic pathway to rehabilitation, something this Court must consider under § 3553(a).

## V. A sentence of 30 years' imprisonment will accomplish the purposes of sentencing.

One judge has framed the purposes of sentencing as follows:

> Deterrence, incapacitation, and rehabilitation are prospective and societal – each looks forward and asks: What amount and kind of punishment will help make society safe? In contrast, retribution imposes punishment based upon moral culpability and asks: What penalty is needed to restore the offender to moral standing within the community?

*United States v. Cole*, slip op., 2008 WL 5204441 *4 (N. D. Ohio Dec. 11, 2008). Here, a sentence of 30 years' imprisonment will adequately address both the retrospective and prospective purposes of sentencing without being unduly harsh. A sentence that is too harsh is unjust, threatens to diminish respect for the law, creates unwarranted disparities, and could impede rehabilitation and treatment efforts.

**A. *Just punishment***

Section 3553(a)(2)(A) requires the judge to consider "the need for the sentence imposed…to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." This consideration is retrospective, focusing on the offense, Mr. Buenaga's blameworthiness, and the harm caused by the crime. Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?*, 89 Minn. L. Rev. 571, 590 (February 2005).

The Court should not consider the offense in isolation. Mr. Buenaga's mental state at the time of the offense is relevant in determining what is "just" punishment. This is also true for his cognitive characteristics and challenging environment. As summarized above, his behavior at the time was atypical. He was acting impulsively and destructively when he committed the offense. He was unable to experience empathy. He was suicidal and behaving erratically. In other words, what fueled the real issue was that he was experiencing a profound loss of control indicative of his borderline personality disorder. Cognitively, Mr. Buenaga was primed to engage in reckless, disinhibited behavior, which is exhibited in the offense conduct.

Mr. Buenaga is in his mid-30s now. The defense is requesting a 30-year sentence. Upon release, then, Mr. Buenaga will have spent half his life in prison. This is a considerable punishment, especially for someone without a criminal history. Such a sentence will necessarily have a

tremendous impact, even before one considers the permanent effects of branding as a sex offender. As several courts have recognized, collateral consequences of conviction, such as registration as a sex offender, are relevant to the "need" for the sentence imposed to reflect just punishment. *See, e.g.*, *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (noting that consideration of collateral consequences of a conviction is consistent with § 3553(a)); *United States v. Wachowiak*, 496 F.3d 744, 747 (7th Cir. 2007) (affirming variance based on "the stigma of being a sex offender"), *abrogated on other grounds by Nelson v. United States*, 555 U.S. 350, 351 (2009).

**B. *Adequate deterrence***

The focus of this Court's inquiry under § 3553(a)(2)(B) is "marginal deterrence," *i.e.,* "whether any particular quantum of punishment results in increased deterrence and thus decreased crime." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28–29 (2006). It is a commonly held belief that the higher the sentence, the greater the effect in deterring others; however, empirical research shows no serious relationship between sentence length and general deterrence. Rather, "while *certainty* of punishment has a deterrent effect, 'increases in severity of punishments do not yield significant (if any) marginal deterrent effects." *Id.*; *see also* Anthony N. Doob & Cheryl Marie Webster, *Sentence Severity and Crime: Accepting the Null Hypothesis*, 30 Crime & Just. 143, 187 (2003) (finding "no conclusive evidence that supports the hypothesis that harsher sentences reduce crime through the mechanism of general deterrence").

Moreover, "serious sexual and violent crimes are generally committed under circumstances of extreme emotion, often exacerbated by the influence of alcohol or drugs." Tonry, *Purposes and Functions of Sentencing*, at 28–29. That was the case here. And research further shows that lengthier prison sentences do not achieve better recidivism rates. With respect to sex offenses,

individual studies and meta-analyses consistently find that "incarceration has little, if any, impact on recidivism." Kevin L. Nunes, et al., *Incarceration and Recidivism among Sexual Offenders*, 31 Law & Human Behavior 305, 314 (2007). Indeed, not only is the evidence in support of incarceration's deterrent effect "unimpressive," a study found that, "[c]ounterintuitively, some [sex] offenders may actually experience incarceration as *less* aversive that some alternative sanctions." *Id.* at 306.

Thirty years is a sufficient sanction to deter others and to deter Mr. Buenaga.

**C. *Treatment and rehabilitation***

As a condition of the Court's sentence, Mr. Buenaga requests a recommendation for comprehensive mental health care, substance abuse treatment, and sex offender treatment. Mr. Buenaga wants treatment and knows he needs it.[3]

The diagnosis of borderline personality disorder, when first received in 2025, provided a launchpad from which Mr. Buenaga could begin to move forward and understand what was going on with him. Now, the recommendations of Dr. Keller and Dr. Robinson, when taken together with the prior diagnostic reports, allow for a path forward which will protect the community. The primary course of treatment for BPD is Dialectical Behavior Therapy ("DBT"). "DBT provides skills in distress tolerance, emotion regulation, and interpersonal effectiveness that could help him manage emotional distress, respond more adaptively to perceived rejection or disconnection, and

---

[3] The Sentencing Reform Act "rejects imprisonment as a means of promoting rehabilitation." 18 U.S.C. § 3582 (mandating that the district court, when deciding whether to impose a term of imprisonment and the length of the term imposed, "recognize[ ] that imprisonment is not an appropriate means of promoting correction and rehabilitation"). In *Tapia v. United States*, 564 U.S. 319 (2011), the Supreme Court unanimously held that a district court is prohibited from imposing or increasing a term of imprisonment in order to promote rehabilitation.

reduce reliance on impulsive or maladaptive behaviors." Exh. 1B, at 8. It should be noted that in the Bureau of Prisons, DBT is classified as an evidence-based recidivism reduction program.

Mr. Buenaga further asks this Court to recommend that he receive substance abuse treatment while incarcerated. Stimulants including methamphetamine and cocaine contributed to his conduct. Consistent with this finding, Dr. Keller recommends substance use treatment because a return to substance use could increase his recidivism risk.

Mr. Buenaga also wishes to pursue sex offender treatment. Reviews of sex offender treatment programs show that cognitive behavioral therapy, relapse prevention, and self-regulation have proven successful in treating offenders. Mr. Buenaga would benefit from this treatment as well and is a good candidate for it.

It bears emphasis that the treatment Mr. Buenaga needs can continue upon release into the community. Kimberly Wiebrecht, *Evidence-Based Practices and Criminal Defense: Opportunities, Challenges, and Practical Considerations* 8 (2008), http://nicic.gov/library/files/023356.pdf ("[t]he research...states that treatment interventions are more effective when provided to defendants while they are in the community rather than in an institutional setting."); *see also* Bitna Kim et al., *Sex Offender Recidivism Revisited: Review of Recent Meta-analyses on the Effects of Sex Offender Treatment*, 17 Trauma, Violence, and Abuse 1, 11 (2016) ("The research indicates that treatment in the community is more effective than treatment in institutions.").

**D. *Need to avoid unwarranted disparities***

In general, life sentences are vanishingly rare in the federal system, whatever the advisory guidelines recommend. *See* U.S.S.C., *Life Sentences in the Federal System* (July 2022), at 2–3, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-

publications/2022/20220726_Life.pdf (finding 0.2 percent of all persons sentenced in federal court during fiscal years 2016-2021 received life sentences, and 0.2 percent received effective life sentences). Of those sentenced to life, the vast majority did not plead guilty, unlike Mr. Buenaga. *Id.* at 2. What's more, available sentencing data from the Judiciary's Sentencing Information tool, JSIN, show that life sentences are unusual even for the crimes of conviction here:




**Note:** The figure includes the 963 defendants reported to the Commission (1) whose primary guideline was §2G2.1, with a Final Offense Level of 43 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure; and (2) the defendant received a sentence of imprisonment in whole or in part. Cases missing information necessary to complete the analysis were excluded from this figure.

https://jsin.ussc.gov/analytics/saw.dll?Dashboard (sentences of life or >470 months treated as equal to 470 months).

Regarding particular cases where disparity might be considered, the sentencing outcomes, as expected, depended on the individual facing sentencing and the facts of the case. In *United States v. Christopher Scott Jones,* a Newport News firefighter was arrested when attempting to meet up with a minor. Further investigation revealed Mr. Jones' molestation of at least three minor children over a period of time, at least one of them being his stepchild. There appeared to have been additional child pornography related viewing and activity taking place over several months. Mr. Jones eventually entered a guilty plea, and the Court sentenced him to 405, or approximately 33 years. *See United States v. Christopher Scott Jones*, 4:23cr32 (E.D. Va. 2023) (Walker, J.);

https://www.pilotonline.com/2023/09/20/former-newport-news-fire-lieutenant-sentenced-to-30-years-for-child-sex-crimes-pornography/.

Gregory Seerden received a sentence of 324 months, or 27 years, for one count of production of child pornography. *United States v. Gregory Kyle Seerden*, 2:17cr67 (E.D. Va. 2018) (Jackson, J.). A Navy SEAL, Mr. Seerden received a complaint of sexual assault, which resulted in the Naval Criminal Investigative Service looking into the situation. Upon the execution of the search warrant, a review of Mr. Seerden's media revealed four videos of a his five-year-old daughter being subjected to sexually explicit conduct. In addition to the federal charges, Mr. Seerden was facing prosecution in San Diego, California, for production and sexual abuse. *See* 2:17cr67, ECF No. 57, at 6–7.

In *United States v. Asia Billups*, No. 4:24cr70-1, ECF No. 74 (E.D. Va. 2025) (Allen, J.), the defendant pleaded guilty to two production counts and one distribution count and was sentenced to a total term of 180 months' imprisonment. The government had requested a sentence of 540 months based on the defendant's exploitation of "those for whom she should have cared and loved most, her family." *See* ECF No. 70, at 4. The government highlighted that the defendant's offense level there should have been 55, as the case involved sexual contact with minors under the age of 4 who were in the care of the defendant. *Id.* at 2–3. Additionally, Ms. Billups's codefendant received a sentence of 204 months' imprisonment with similar facts, a guideline range of life, and a request by the government for 600 months. *United States v. Michael Machoniz*, No. 4:24cr70-2, ECF Nos. 90, 93 (E.D. Va. 2026).

In *United States v. Cortista*, No. 4:22cr69, ECF No. 41 (E.D. Va. 2023) (Young, J.), the 38-year-old defendant was convicted of production of child pornography, where he made two

videos performing oral sex on a 4-year-old boy he sometimes cared for. The Court sentenced him to 210 months' imprisonment.

In *United States v. Zackary Sanders*, No. 1:20-cr-143 (E.D. Va. 2022) (Trenga, J.), the defendant was convicted of five counts of production, six counts of receipt, and one count of possession and sentenced to 216 months. He met several of his many victims in person, and "one reported that the defendant forcibly locked a cage-like device around his genitals in his high school's parking lot." ECF No. 604, at 19. According to the government, he never showed even "a scintilla of remorse." *Id.* at 1.

In *United States v. Dylan Seader*, No. 2:22cr69, (E.D. Va. 2023) (Smith, J.), the defendant received 240 months for production of child pornography. A forensic review of the defendant's devices revealed "several sexually explicit videos of the defendant with an approximate 18-month-old child. Seader was performing a sexual act on the child." *See* ECF No. 31, at 2. Also, on his devices were "two known series of child pornography, as identified by the National Center for Missing and Exploited Children." *Id*. The defendant was only caught because he agreed to meet up and have sex with an individual he believed to be a fourteen-year-old child.

In *United States v. Joseph Allen*, 2:24cr16 (E.D. Va. 2024) (Hanes, J.), the defendant sexually assaulted a four-year old girl, recorded the assault, and disseminated the recordings. According to the government, the evidence showed that the defendant was "excited and eager to hurt the little girl." Allen would go on to share child sexual abuse material over the internet, including for a profit." *See* ECF No. 37, at 3-4. The Court sentenced the defendant to 276 months.

Rian Wayne Johnson received a sentence of 324 months. *United States v. Rian Wayne Johnson*, 4:25cr59 (E.D. Va. 2026) (Hanes, J.). Mr. Johnson was a primary caregiver of an eleven-year-old girl, but he was not the biological father. Mr. Johnson appears to have taught the minor

girl how to perform sex acts, and he videotaped the behavior, which was saved on his phone. There were also many images of child pornography of unknown children in his possession.

These cases are each distinguishable, in ways that are aggravating and mitigating at different times. Rather than serve as a fixed anchor, the Court should view them as guideposts that indicate that a life sentence—or even a sentence significantly exceeding 30 years—is greater than necessary and would result in unwarranted disparities.

### E. *Lifetime Supervision and Public Protection*

Mr. Buenaga anticipates a life term of supervised release. Lifetime supervised release will ensure that, upon Mr. Buenaga's release in his 60s, he will remain under the observation and control of the probation system. He will be required to maintain residence restrictions, submit to searches, participate in sex offender registration, and engage in ongoing mental health and sex offender treatment. If he violates the terms of his release, he will be returned to custody. Lifetime supervision thus provides an additional layer of public protection without the necessity of a longer prison sentence.

Section 3553(a)(2)(C) requires this Court to consider "the need for the sentence imposed…to protect the public from further crimes of the defendant." This purpose relates to defendant's risk of recidivism and the danger posed by the defendant, if any. It "is particularly important for those offenders whose criminal histories show repeated serious violations of the law." S. Rep. No. 98-225 at 76 (1983).

Conversely, "[w]here the particular defendant convicted of a child pornography offense has a low potential for recidivism, particularly where that low potential is well informed by expert evaluations and the defendant's post-arrest conduct, the defendant has no significant prior criminal history, and where the defendant appears genuinely remorseful about his crimes and aware of the

harm that they cause, several courts have found little need to impose a full guideline sentence to protect the public." *United States v. Beiermann*, 599 F. Supp. 2d 1087, 1112 (N.D. Iowa 2009) (Bennett, J.). Though the offense here was the production of child pornography, the same principles apply in Mr. Buenaga's case. He is aware of the harm he has caused, is remorseful, and amenable to treatment. He has gained considerable insight into his offense conduct since his arrest, and this is his first offense. Moreover, experts have indicated that the factors contributing to his recidivism risk can be mitigated with proper treatment. Exhs. 1B and 2B; *See also* Renee Sorrentino, M.D., et al, *Sex Offenders: General Information and Treatment*, 48 Psychiatric Annals 120, 123 (2018) ("The dynamic factors and criminogenic needs that are associated empirically with reoffending are ones that can be changed through intervention…").

There is substantial evidence that prison, by disrupting employment, reducing prospects of future employment, weakening family ties, and exposing less serious offenders to more serious offenders, leads to increased recidivism. This is a concern here, where Mr. Buenaga is facing such a lengthy term of imprisonment and is incarcerated far from his support system. As discussed above, proper treatment is essential to mitigate risk of re-offense and protect the public, and that is best accomplished in the community.

## CONCLUSION

Thirty years is a harsh sentence that will accomplish the purposes of sentencing while complying with § 3553(a)'s mandate. This Court can impose a term of supervision up to life to address any lingering concerns regarding recidivism and public safety.

Sentencing will punctuate this painful chapter and will shape the new beginning that all involved have been earnestly pursuing.

Respectfully submitted,

ALEX TYLER BUENAGA

By:__________________/s/__________________

Suzanne V. Suher Katchmar
Virginia State Bar No. 37387
Assistant Federal Public Defender
Attorneys for Alex Tyler Buenaga
Office of the Federal Public Defender
500 East Main Street, Suite 500
Norfolk, Virginia 23510
Telephone: 757-457-0890
Facsimile: 757-457-0880
suzanne_katchmar@fd.org

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 19th day of October, 2026, I will electronically file the foregoing with the Clerk of Court using the CM/EMF system, which will send a notification of such filing (NEF) to the following:

Joseph L. Kosky
Assistant United States Attorney
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
elizabeth.yusi@usdoj.gov

I FURTHER CERTIFY that a true and correct copy of the foregoing will be sent by electronic mail to:

Nicole Pender
United States Probation Officer
600 Granby Street, Suite 200
Norfolk, Virginia 23510

/s/

Suzanne V. Suher Katchmar
Assistant Federal Public Defender
Virginia State Bar No. 37387
Attorney for Alex Tyler Buenaga
Office of the Federal Public Defender
500 East Main Street, Suite 500
Norfolk, Virginia 23510
Telephone: (757) 457-0890
Facsimile: (757) 457-0880
Email: suzanne_katchmar@fd.org